UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WALTER HAWRANEK, <br> DAVID FATT, <br> DAVID HOTZ, <br> KENNETH KOLBE, <br> TIM MCGRAW, <br><br> Plaintiffs, <br><br> v. <br><br> HAIER US APPLIANCE SOLUTIONS, INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 1:17-cv-03347-JRS-MPB |

**Opinion and Order**

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 32.) Plaintiffs Walter Hawranek, David Fatt, David Hotz, Kenneth Kolbe, and Tim McGraw (collectively, "Plaintiffs") filed a three-count Complaint against Defendant Haier US Appliance Solutions, Inc. d/b/a General Electric Appliances ("Haier") alleging that Haier (1) violated the Worker Adjustment Retraining and Notification (WARN) Act, 29 U.S.C. § 2104, (2) breached a contract regarding Plaintiffs' "layoff benefits," and (3) breached third-party representations and warranties Haier made to the federal government. (ECF No. 1) Haier now seeks summary judgment on all of Plaintiffs' claims. After carefully reviewing the motion, response, reply, and relevant law, the Court concludes that the motion should be **GRANTED**.

1

## I. Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome-determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).

In ruling on a motion for summary judgment, the Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Ault v. Speicher*, 634 F.3d 942, 945 (7th Cir. 2011). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question, then the court must enter summary judgment against [him]." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986).

## II. Background

Plaintiffs are former salaried employees of General Electric's ("GE") refrigerator manufacturing plant, Bloomington Production Operations, LLC ("BPO"). ([ECF No. 33 at 3](#).) On June 6, 2016, Haier acquired BPO. (Hollinger Dec. ¶ 3.) BPO had 329 employees: 301 hourly, union represented employees and 28 salaried employees, including the five Plaintiffs. ([ECF No. 33 at 3](#); [ECF No. 1](#) ¶ 13.) Prior to the sale of BPO, the United States Department of Justice conducted an anti-trust review on the proposed sale and the sale was approved. ([ECF No. 1](#) ¶¶ 5-6).

In addition to its acquisition of BPO, Haier acquired the stock of BPO and the "collective bargaining agreement" between BPO and GE Appliances' Union. ([ECF No. 33 at 3](#); [ECF No. 34-12](#) ¶ 3, Ex. 1.) Haier also acquired GE Appliances' defined benefit pension plan ("Haier Pension Plan"), which provided benefits to both hourly and salaried BPO employees on the event of the plant's closure. ([ECF No. 33 at 3](#); [ECF No. 34-12](#) ¶ 3, Ex. 1.)

Shortly after Haier acquired BPO, BPO plant manager Frank Scheffel announced to employees verbally and in writing that Haier intended to close BPO on June 15, 2017. ([ECF No. 1](#) ¶ 26; [ECF No. 34-12 at 3](#); [ECF No. 34-4 at 4](#) p. 12:11-16; [ECF No. 34-12](#) ¶ 5.) Scheffel's letter also informed employees about benefits, stating that "all employees – hourly and salaried – [would] receive equivalent, **comprehensive plant-closing benefits** [which employees] would have received under GE ownership." ([ECF No. 34-12 at 82](#); Hollins Decl. Ex. 2; [ECF No. 34-1 at 7](#) p. 18:20-19:8.) Scheffel also provided employees excerpts from the GE Appliances'

3

Job Loss Handbook which outlined the benefit options available to eligible BPO employees when BPO closed. ([ECF No. 34-12](#) ¶ 7; [ECF No. 34-7 at 41](#):9-15.) These excerpts outlined the benefit options available to eligible BPO employees:

> **Severance**
> - **Lump-sum severance payment:** Employees with 15 or more years of service receive a lump-sum severance payment equal to two weeks of pay for each year of service. For example, an eligible employee with 25 years of service making $1000 a week would receive a severance payment equal to $1,000 x 2 weeks x 25 years for a total payment of $50,000.
>
>   Employees with one to 14 years of service receive one-and-one-half weeks of pay for each year of service calculated on the same basis. The minimum severance payment for eligible employees equals at least four weeks of pay.
>
> **Special Early Retirement Option (SERO)**
> - Eligible employees who are ages 55 through 59 with 25 or more years of pension qualification service will have the opportunity to elect early retirement with full pension benefits. Benefits include full pension earned as of the date of the plant closing. In addition, supplements of $21 a month for every year of pension benefit service, plus $425 per month, are paid to the age when an employee is eligible to begin receiving 80% of his or her Social Security benefit. Benefits for those retiring under this option are the same as those available to long-service employees who retire at age 60. Severance benefits are reduced or eliminated by value of SERO and cost of future health benefits.
>
> **Plant Closing Pension Option (PCPO)**
> - Eligible long-service employees, not eligible for SERO who meet the following age and service requirements by the end of the calendar year in which service terminates because of the plant closing, will be eligible for the same pension benefits as those available to long-service employees who retire at age 60 or under SERO, including pension supplements. Severance benefits are reduced or eliminated by value of PCPO and cost of future health benefits.

([ECF No. 34-9 at 12](#).)

On July 15, 2016, BPO's Human Resources Manager Latiece Hollinger sent an email to BPO's salaried employees, clarifying the benefits available to "eligible BPO salaried employees affected by layoff due to plant closing." ([ECF No. 34-12](#) ¶ 7; [ECF No. 34-12 at 91](#).) These benefits included the following:

4

**Layoff/Medical**
- With a signed release, the benefit is the greater of 4 weeks pay or 1 week of pay for each full year of continuous service, plus ¼ week pay for each additional 3 months worked. Includes 6 months continued medical/dental/vision.
- Without signed release 2 weeks pay and 60 days medical.

**Special Early Retirement Option (SERO)**
- Eligible employees (hired before 1/1/05) who are ages 55 through 59 with 25 or more years of pension qualification service will have the opportunity to elect early retirement with full pension benefits. Benefits include full pension earned as of the date of the plant closing. In addition, supplements of $21 a month for every year of pension benefit service, plus $425 per month, are paid to the age when an employee is eligible to begin receiving 80% of his or her Social Security benefit. Benefits for those retiring under this option are the same as those available to long-service employees who retire at age 60. Layoff benefits are reduced or eliminated by value of SERO and cost of future health benefits.

**Plant Closing Pension Option (PCPO)**
- Eligible (hired before 1/1/05) long-service employees, not eligible for SERO who meet the following age and service requirements by the end of the calendar year in which service terminates because of the plant closing, will be eligible for the same pension benefits as those available to long-service employees who retire at age 60 or under SERO, including pension supplements. Layoff benefits are reduced or eliminated by value of PCPO and cost of future health benefits.

(ECF No. 34-12 at 90-92.)

Both Hollinger's and Scheffel's letters also included disclaimers that (1) "the Plan document governs in all cases," with respect to benefits summarized in the Job Loss Handbook, and (2) the letters were simply a "summary of the major elements of the package[s] available to eligible employees." (ECF No. 34-12 at 84, 91.) The Job Loss Handbook also contained explicit disclaimers that: (1) [the] Handbook does not create a contract of employment between the Company and any individual," (2) the Company reserves the right to terminate, amend, suspend, replace or modify the plans at any time and for any reason. No individual has a vested right to any benefit under a plan," and (3) "[the] Handbook is part of the summary plan descriptions for

5

health, life insurance, disability and certain other GE plans or programs . . . which are available to eligible Company employees." (ECF No. 34-9 at 76-97.)

On August 11, 2016, Scheffel sent another letter to BPO employees informing them that BPO's closing had been finalized, and that "an agreement was reached that treats employees exceptionally well, with one of the most significant outcomes being that all **hourly** employees will receive 90% of their base wages and unreduced Company benefits through June 15, 2017, while not being required to work" (the "layoff income benefit" or "income benefit"). (ECF No. 34-5 at 53:17-22; ECF No. 34-3 at 18:2-8; ECF No. 34-4 at 17:9-19; ECF No. 34-12 ¶ 9.) Salaried employees were eligible to retire under one of Haier's retirement options: (1) the Special Early Retirement Option ("SERO") or (2) the Plant Closing Pension Option ("PCPO"). (ECF No. 33 at 3-6.)

Employees who elected to retire under the SERO or the PCPO would receive a fully funded pension as if the employee had retired at age 60. The plan also included a "special early retirement option offset" which "include[d] the present value of the ***difference*** between the Pension benefits the [e]mployee would be eligible to receive absent exercise of the [SERO] or [PCPO]." (ECF No. 33 at 4.) In other words, a salaried employee's final SERO or PCPO benefit would be reduced or eliminated by the amount of layoff or severance benefit the employee received. (ECF No. 34-10, Dep. Ex. 49, p. 8.)

Production at the BPO ceased in late August 2016. (ECF No. 34-12 ¶ 9.) All Plaintiffs except David Fatt received written notice of their layoff on October 18, 2016.

6

(ECF No. 34-3 at 20:8-19.) These four plaintiffs were laid off during the last week of November and were paid through November 30, 2016. (ECF No. 34-3; ECF No. 34-3 at 28:1-16.) David Fatt worked until February 24, 2017, was paid through February 29, 2017, and retired on March 1, 2017. (ECF No. 34-1, ECF No. 34-1 at 9:20-10:11; Dep. Ex. 43; ECF No. 34-12 ¶ 10.)

Hawranek's, Kolbe's, Hotz' and McGraw's layoff notices explained that they would be "laid off effective the end of the day, November 23, 2016." (ECF No. 34-5 at 85:19-23; ECF No. 34-9, Dep. Exs. 13, 26, 34, and 38.) The layoff letters further explained that certain layoff benefits were available if plaintiffs signed a "layoff benefit release form" ("release form") and released Haier from any liability stemming from BPO's closing and the resulting job loss. (ECF No. 34-5 at. 85:19-23; ECF No. 34-2 at 31:19-32:11; ECF No. 34-3 at 20:8-19; ECF No. 34-4 at 25:2-16.)

McGraw claimed he never received his layoff income benefit, and on October 24, he submitted a complaint to Haier claiming he had been denied his "90% of [his] base wages and unreduced Company benefits through June 15, 2017." (ECF No. 34-5 at 53:17-22; ECF No. 34-3 at 18:2-8; ECF No. 34-4 at 17:9-19; ECF No. 34-12 ¶ 9.) McGraw claimed that this layoff income benefit was supposed to "bridge [him] from [his] [l]ayoff date until [his] [p]lant [c]losing date of June 15, 2017. . . ." (ECF No. 34-5 at 89:4-13; ECF No. 34-9, Dep. Ex. 14.) As such, McGraw believed June 15, 2017 was the universal plant closing date for all employees, hourly and salaried, and upon that plant closing date, McGraw believed his retirement benefits would begin. (ECF No. 34-9 at 33, Ex. 14.)

7

Haier's Human Resources Manager, Valorie Hughes responded to McGraw's complaint, explaining that McGraw's understanding of his plant closing date and when his benefits would begin was incorrect. (ECF No. 34-9 at 37.) Hughes explained that (1) McGraw's "PCPO benefits [would] take effect following [his] layoff due to plant closing date . . ."; (2) in order to receive the PCPO benefits, McGraw was required to "retire by the first day of the month following [his] termination"; and (3) the only way McGraw would be eligible for the layoff income benefit was if he wanted to "forgo [his] PCPO benefits . . ." which included "4 weeks [of] pay; or 1 week of pay for each full year of continuous service, plus ¼ of a week of pay for each additional 3 months worked." (ECF No. 34-9, Dep. Ex. 15, p. 1; Hughes Dec. ¶ 4; Ex. 1; ECF No. 34-9, Dep. Ex. 15, p. 1; Hughes Dec. ¶ 4; Ex. 1.) In other words, McGraw's individual "layoff due to plant closing date" was November 23, 2016, not June 16, 2017, and McGraw must have retired by December 1, 2016 to receive his PCPO benefits.

Plaintiffs Hawranek, Kolbe, and McGraw retired effective December 1, 2016. (ECF No. 34-5 at 77:9-18, 96:20-97:25; Dep. Ex. 18; ECF No. 34-2, ECF No. 34-2 at 44:17-45:5; Dep. Ex. 28; ECF No. 34-4, ECF No. 34-4 at 36:25-37:9; Dep. Ex. 41.) Plaintiff David Hotz signed the release form and received his layoff income benefit, to include "one-week [of] severance [pay] per year of service and six months' health insurance." (ECF No. 34-3, ECF No. 34-3 at 15:24-16:9, 21:7-21; Dep. Exs. 6, 35.) Hotz' last workday at Haier was sometime in late November 2016. (ECF No. 34-3 at 5.) At the time of the announcement that BPO would close, Hotz was not yet retirement eligible, so he elected to take the severance payment. (ECF No. 34-3 at 6,

8

8.) The other four Plaintiffs failed to sign the release form and retired under either the SERO or PCPO retirement plan, signing the a "Pension Plan Notification of the Decision to Retire" form ("retirement form"). (ECF No. 34-1 at 10:21-25-11:1; ECF No. 34-2 at 33:10-20; ECF No. 34-4 at 36:25-37:18-25; ECF No. 34-9 at 130-134.)

Plaintiffs McGraw, Hawranek, and Kolbe filed "identical requests for mediation under [Haier's Alternative Dispute Resolution Program][,] Solutions[,]" arguing that they should have received "the same benefits for a plant closing or [a] layoff as [they] would have received from GE . . ." to include the "layoff benefit" followed by the "plant closing benefits that arise on the date of the plant closing." ([ECF No. 34-5 at 98](#):18-25; [ECF No. 34-2 at 37](#):5-10; [ECF No. 34-4 at 40](#):23-41:7; Dep. Exs. 19, 29.) On February 21, 2017, Haier sent letters to McGraw, Hawranek, and Kolbe, informing them that their claims were ineligible for arbitration under the "Solutions" program because the claims were "excluded" from benefits and were "covered by the Employee Retirement Income Security Act of 1974 (ERISA)." ([ECF No. 34-5 at 99](#):11-16; [ECF No. 34-2 at 38](#):5-14; Dep. Exs. 21, 30.) The letter further explained that (1) the plaintiffs' claims "may be submitted as . . . claim[s] for benefits under the GE Appliances pension plan[,]" and (2) any such claims "[could] be filed with the Plan Administrator for the plan." (Id.)

### III. Discussion

Defendant seeks summary judgment on all three of Plaintiffs' claims, arguing: (1) Plaintiff Hotz should be dismissed from the suit because he signed the release form; (2) Plaintiffs fail to state a claim for breach of contract; (3) Plaintiffs fail to state a

9

claim under their third-party beneficiary theory; (4) Plaintiffs' breach of contract and third-party beneficiary claims are preempted by ERISA; and (5) Plaintiffs fail to state a claim for violation of the WARN Act, as Plaintiffs fail to prove there was a "plant closing" or "mass layoff" as defined by the Act. (ECF No. 33 at 20-30.) Plaintiffs respond and allege several factual disputes to include: (1) Plaintiffs dispute that Fatt, Hawrenek, Hotz, Kolbe, and McGraw "voluntarily retired;" (2) Plaintiffs dispute that they received pay for at least 60 days following notice to them of their layoffs; (3) Plaintiffs dispute that the value of the layoff benefit is reduced or eliminated by the SERO or PCPO retirement benefit; (4) Plaintiffs dispute that the layoff benefit at issue is included in an ERISA plan; (5) Plaintiffs dispute that ERISA preempts their breach of contract and third-party beneficiary claims; and (6) Plaintiffs dispute that no plant closing or mass layoff occurred with respect to Plaintiffs. (ECF No. 59 at 1-7.)

### a. Plaintiff David Hotz

Defendants argue in their motion that Plaintiff Hotz must be dismissed from the present lawsuit because he signed the release form releasing Haier from liability. Plaintiffs fail to respond to this argument and fail to adduce evidence rebutting Defendant's argument. A release is a surrender of a claimant's right to prosecute a cause of action. *Gearhart v. Baker,* 393 N.E.2d 258, 260 (Ind. Ct. App. 1979). Release agreements, like contracts generally, are interpreted as a matter of law. Absent ambiguity, release provisions are interpreted as a matter of law, and courts look only to the instrument to ascertain the parties' intent. *Moore v. Wells*

10

*Fargo Constr.*, 903 N.E.2d 525, 531 (Ind. Ct. App. 2009) (quotation marks and internal citations omitted).

In Indiana, the rules governing the construction of contracts also govern the construction of releases. *Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 357 (Ind. Ct. App. 1995) (applying contract rules to release to determine that defendant was not a party to release); *cf. Carona v. Ill. Cent. Gulf R.R. Co.*, 561 N.E.2d 239, 242 (Ill. Ct. App. 1990) ("A release is a contract wherein a party relinquishes a claim to a person against whom the claim exists, and a release is subject to the rules governing the construction of contracts.") (citation omitted). Under Indiana law, contracts are interpreted to ascertain and effectuate the intent of the parties as reasonably manifested in the agreement, and if the language of the contract is clear and unambiguous, it should be given its plain and ordinary meaning. *See also Rodenbeck v. Marathon Petroleum Co.*, 742 F. Supp. 1448, 1454 (N.D. Ind. 1990) ("Interpretation of a release, like any other contract, is determined by the language of the particular instrument, considered in light of all the facts and circumstances."). *Reuille v. E.E. Brandenberger Constr., Inc.,* 888 N.E.2d 770, 771 (Ind. 2008). Thus, courts give effect to the intentions of the parties as expressed in the four corners of the agreement, and courts determine the meaning of a contract from an examination of all of the contract's provisions, and not from a consideration of individual words, phrases, or paragraphs read alone. *Moore,* 903 N.E.2d at 531. An ambiguity does not arise simply because the parties disagree on the interpretation; rather, contract language is ambiguous only if reasonable people could come to different conclusions about its

11

meaning. *Simon Prop. Group, L.P. v. Mich. Sporting Goods Distribs., Inc.*, 837 N.E.2d 1058, 1070 (Ind. Ct. App. 2005).

In this case, the release form was not ambiguous. The release form clearly stated that in exchange for (1) the full layoff benefit and (2) up to four months of medical insurance, the employee would "agree to waive and release all waivable claims of any kind (whether known or unknown)." (ECF No. 34-9, Dep. Ex. 35.) The release Hotz signed also included the following language: "I acknowledge that I am not waiving any rights or claims **that may arise after the date I execute this Release**. This Release does not modify or affect any vested rights and benefits that I may have under any applicable Company benefit plan." (ECF No. 34-9, Dep. Ex. 35.) In light of the "arise after the date" language, Hotz argues that his claim against Defendant in the present suit is not barred because the claims he asserts in the present lawsuit constitute "future" claims not expressly limited by the release form, as the claims allegedly relate to a benefit that falls in the "arise after the date" of execution category. (ECF No. 34-3 at 34:13-35:9, Dep. Ex. 35.) Contrary to his own claim, however, Hotz testified at deposition that he understood that any plant closing benefits would be received *after* the date he executed his release form. (ECF No. 34-3 at 34:16-35:12.) Accordingly, Hotz is dismissed from this suit for failure to state a claim, as he released all claims against Haier when he signed the release form. *See Ellis v. DHL Exp. Inc., (USA)*, 633 F.3d 522, 528 (7th Cir. 2011) (holding that WARN Act claims can be waived by a general release form). In addition, Hotz fails to present

any evidence to show how his present claims fall outside the scope of the release form he signed.

### b. **WARN Act**

The WARN Act seeks to protect workers who suffer employment losses due to mass layoffs or plant closings by requiring that certain employers provide sixty days-notice to workers before engaging in a mass layoff or plant closing as defined by the Act. 29 U.S.C. § 2102(a). If an employer fails to give notice as required under the WARN Act, any aggrieved employee has the right to sue the employer for back pay and benefits. 29 U.S.C. § 2104. A WARN "employment loss" is one that is "an employment termination, **other than** a discharge for cause, **voluntary departure**, **or retirement**, . . ." 29 U.S.C. § 2101(a)(6) (emphasis added).

Under the WARN Act, a "plant closing" is the "permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees excluding any part-time employees." 29 U.S.C. § 2101(a)(2). A "mass layoff" is a reduction in force that is not the result of a plant closing and results in an employment loss at a single site of employment during any 30-day period for (1) at least 33 percent of the employees (excluding any part-time employees); and at least 50 employees (excluding any part-time employees); or (2) at least 500 employees (excluding any part-time employees). 29 U.S.C. § 2101(a)(3).

Defendant moves for summary judgment on Plaintiffs' WARN Act claim, which alleges that Haier violated the Act when it failed to give Plaintiffs the required sixty days' written notice of a "plant closing or mass layoff." 29 U.S.C. § 2102(a). (ECF No. 1 at ¶ 30.) Defendant presents two arguments for summary judgment with respect to this claim: (1) Plaintiffs' WARN Act claim should be dismissed because there was no "plant closing" or "mass layoff" to trigger the Act's sixty-day notice requirement (ECF No. 33 at 29), and (2) because Fatt, Hawranek, Kolbe and McGraw "voluntarily retired," they did not suffer any "employment loss" under the Act. (ECF No. 33 at 2.)

Even assuming there was a plant closing, Plaintiffs' WARN Act claim fails because Plaintiffs voluntarily retired from Haier, and thus, did not suffer an "employment loss" as defined by the WARN Act. (ECF No. 34-2 at 28:16-25; ECF No. 34-9 at 19; ECF No. 33 at 7.) Plaintiffs refute the voluntariness of their retirement, arguing that none of Haier's offered alternatives to retirement were viable, and as such Plaintiffs had no choice but to retire. (ECF No. 59 at 2-3.) Plaintiffs also fail to submit evidence or case law authority in support of this position. The Court therefore rejects this argument, as the Seventh Circuit has previously held that a plaintiff's acceptance of a severance package is voluntary notwithstanding any less attractive options such as signing a release, remaining on a recall list, or pursuing claims against the employer. *See Ellis v. DHL Exp. Inc. (USA),* 633 F.3d 522, 528 (7th Cir. 2011).

The court in *Ellis* held that employees who signed a severance agreement and release did not suffer employment loss under WARN. *Ellis,* 633 F.3d at 528. In *Ellis*,

14

DHL announced that it would close six facilities. *Ellis*, 633 F. 3d at 523. As a result of the closing announcement and the subsequent plant shut down, many employees voluntarily signed severance agreements. *Id.* at 523-524. The Seventh Circuit held that because these employees voluntarily signed the severance agreements, they did not suffer an "employment loss" under WARN. *Id.* at 528.

While the retirement form Hawranek, Fatt, Kolbe, and McGraw signed was not, a "severance" agreement or package per se, as in *Ellis*, the pension forms Plaintiffs signed were signed "voluntarily," just as the severance agreements in *Ellis* were signed voluntarily. (*See* ECF No. 34-9 at 130-134.) Plaintiffs were not forced to sign the retirement form, yet they so signed to receive their respective retirement benefits. (ECF No. 34-2 at 28:16-25; ECF No. 34-9 at 19; ECF No. 33 at 7.) In addition, as the Court explained above, "voluntary departures" and "retirement" do not constitute "employment loss[es]" under the WARN Act. *See* 29 U.S.C. § 2101(a)(6) (excluding "voluntary departure or retirement" from the WARN Act's definition of "employment loss"). Therefore, because Plaintiffs voluntarily signed the retirement form and retired, Plaintiffs' WARN Act claim fails as a matter of law.

c. **Third-Party Beneficiary**

Plaintiffs assert that Haier breached representations and warranties it made to the federal government during the anti-trust review process for its acquisition of GE Appliances' BPO. (ECF No. 1.) Plaintiffs allege that Haier represented to Plaintiffs and to the federal government that "all [employee] benefits would remain the same for a term of one year after the acquisition by Haier was made final." (ECF

15

No. 1](ECF No. 1) ¶¶ 8-10.)  Plaintiffs allege that in making these representations, Defendants "induced the federal government to approve the sale of GE Appliances to Haier." ([ECF No. 1](ECF No. 1) ¶ 10.)  Plaintiffs allege that they were third-party beneficiaries of these representations and warranties, and that Haier breached these representations and warranties by failing to give Plaintiffs the promised benefits.  ([ECF No. 1](ECF No. 1) ¶ 39.)

In order to be a third-party beneficiary, a plaintiff must show that (1) the intent to benefit him is clear; (2) the contract imposes a duty on one of the contracting parties in favor of plaintiff; and (3) the performance of the terms necessarily renders to the third party a direct benefit intended by the parties to the contract.  *See [Zurich American Ins. Group v. Wynkoop,](link) 746 N.E.2d 985, 991 (Ind. Ct. App. 2001)* (citing *[Emmons v. Brown,](link) 600 N.E.2d 133, 134 (Ind. Ct. App. 1992)*).

Plaintiffs allege that they were third-party beneficiaries to the representations and warranties Haier made to the federal government, to the extent those representations and warranties concerned Plaintiffs' employment benefits upon Haier's acquisition of BPO.  ([ECF No. 1](ECF No. 1) ¶¶ 39-40.)  Plaintiffs adduce no evidence of their third-party beneficiary status, but even assuming that Plaintiffs were intended third-party beneficiaries during the Haier-BOP acquisition, each plaintiff admitted at deposition that he lacks personal knowledge of what, if any, representations and warranties were made to the federal government before the sale was finalized. Therefore, because Plaintiffs admit that they have no basis for their third-party beneficiary claim, because they offer no other evidence of the alleged representations and warranties Haier made to the federal government, and because they fail to

16

submit evidence of a breach of these alleged representations, this claim fails as a matter of law. (*See* ECF No. 34-4 at 43:7-14; ECF No. 34-3 at 31:10-13; ECF No. 34-2 at 49:3-8; ECF No. 34-5 at 106:21-107:1-7.) Summary judgment in favor of Defendants is proper.

d. **Breach of Contract**

Plaintiffs base their breach of contract claim on the Job Loss Handbook, alleging that according to the terms of the Handbook, they were entitled to receive "equivalent salary continuation" and "layoff benefits" from the last day they worked until June 15, 2017. (ECF No. 34-5 at 13, 27; ECF No. 34-5 at 117:7-12; ECF No. 59 at 3-4.) Plaintiffs argue that upon the BPO's closing they should have received the layoff benefit and salary continuation, in addition to their elected SERO or PCPO pension benefit, consistent with the promise that employees would receive "90% of their base wages and unreduced Company benefits through June 15, 2017." (ECF No. 34-5 at 53:17-22; ECF No. 34-3 at 18:2-8; ECF No. 34-4 at 17:9-19; ECF No. 34-12 ¶ 9.) Defendants argue that salaried employees such as Plaintiffs were not entitled to receive both the layoff benefit and their elected SERO or PCPO pension benefit, as the "pension plan requires layoff benefits be offset." (ECF No. 34-13 ¶ 7.)

Defendants assert that Plaintiffs' breach of contract claim fails because the Job Loss Handbook upon which Plaintiffs base this claim, explicitly states: "(1) [the Job Loss Handbook] is not a contract; (2) it is a summary plan description; (3) the plan document controls, and (4) [Haier] reserves the right to change, modify, or terminate the plan at any time." (ECF No. 33 at 1; 34-9, Ex. 23.) It is well settled that "[t]o

17

recover for a breach of contract, a plaintiff must prove that: (1) a contract existed, (2) the defendant breached the contract, and (3) the plaintiff suffered damage as a result of the defendant's breach." *Morris v. Crain,* 71 N.E.3d 871 (Ind. Ct. App. 2017).

In addition, "[i]t is well-settled in Indiana that employment manuals do not create employment contracts." *Macken v. St. Mary's Med. Ctr. of Evansville, Inc.,* No. EV 02-12-C-M/H, 2003 WL 21510534 at *7 (S.D. Ind. June 26, 2003) (citing *Orr v. Westminster Vill. N., Inc.,* 689 N.E.2d 712, 717 (Ind. 1997)). This is particularly true where the employment manual contains a disclaimer, as in the present case, stating that the manual does not create a contract between the employer and the employee. *See Workman v. United Parcel Serv., Inc.,* 234 F.3d 998, 1000 (7th Cir. 2000) (holding that "a clear and forthright disclaimer" such as one stating that "this policy book is not a contract of employment and does not affect your rights as an employee" is "a complete defense to a suit for breach of contract based on an employee handbook"); *Orr,* 689 N.E.2d at 721.

In this case, the first page of the Job Loss Handbook contained several clear and forthright disclaimers that provided: (1) "This handbook is part of the summary plan descriptions for health, life insurance, disability and certain other GE plans or programs;" (2) "[t]he summary plan descriptions for the plans contain important information about your benefits under the plans but do not include full details of all plan provisions;" (3) "[t]his handbook does not create a contract of employment between the Company and any individual;" and (4) The General Electric Company reserves the right to terminate, amend, suspend, replace or modify the plans at any

18

time and for any reason. No individual has a vested right to any benefit under a plan." (emphasis added). (ECF No. 34-9, Ex. 23 at 1.) Because the Job Loss Handbook contains a clear disclaimer that it is not an employment contract, it was not a contract. Additionally, even if the Handbook were a contract, another of the Handbook's disclaimers makes it clear that "no individual has a vested right to any benefit under a plan," and therefore, Plaintiffs had no vested right to any of the benefits to which they assert under their breach of contract claim. (ECF No. 34-9, Ex. 23 at 1.) Accordingly, summary judgment for Defendants is proper.

## IV. Conclusion

For all of the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment. (ECF No. 32.) Final judgment will be issued separately.

**SO ORDERED.**

Date: 3/29/2019

_____
JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Amanda C. Couture
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
amanda.couture@ogletreedeakins.com

Kenneth B. Siepman
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. (Indianapolis)
kenneth.siepman@odnss.com

Mark R. Waterfill
ATTORNEY AT LAW
mark@waterfilllaw.com